Filed 12/10/13  P. v. Meske CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055743 |
| v. | (Super.Ct.No. RIF137890) |
| NIKOLAUS RYAN MESKE, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Jean P. Leonard, Judge.  Affirmed.

David McNeil Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Lilia E. Garcia and Elizabeth M. Carino, Deputy Attorneys General, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Defendant Nikolaus Ryan Meske was sentenced to 25 years to life in prison after a jury found him guilty of the first degree murder of Sherri Moore in July 2007.  Defendant admitted killing Moore because she "set [him] up" in an attempted burglary.  He bound Moore's mouth and hands with duct tape, slit her throat in several places with a knife, and wrapped her body in sheets and trash bags before dumping it in an orange grove. Two codefendants, Ernesto Pena and Scott Hussey, were also charged with Moore's murder but pled guilty to lesser charges and testified against defendant.[1]

Defendant raises two claims of error on this appeal.  First he claims the admission of prior crimes evidence—a 1997 incident in which he threatened to stab a person with a knife—was irrelevant to prove any fact other than his propensity to commit crimes (Evid. Code, § 1101, subds. (a), (b)),[2] it was unduly prejudicial (§ 352), and its admission violated his due process right to a fair trial.  We agree that the prior crimes evidence was erroneously admitted but conclude the error was harmless.

Second, defendant claims the testimony of the prosecution's expert pathologist concerning the cause of Moore's death and the condition of her body at the time of her death violated his Sixth Amendment right to confrontation.  The expert based his

---

[1] Pena pled guilty to being an accessory after the fact to Moore's murder and was sentenced to three years in prison.  Hussey pled guilty to voluntary manslaughter and was sentenced to 11 years in prison.

[2] All further statutory references are to the Evidence Code unless otherwise indicated.

testimony in part on an autopsy report prepared by another pathologist who did not testify, and the report was not admitted into evidence. Defendant claims that statements in the autopsy report were testimonial and he had a right to confront the declarant. But as defendant acknowledges, the California Supreme Court rejected a substantially identical claim in *People v. Dungo* (2012) 55 Cal.4th 608, 621, and we are bound by *Dungo*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) We therefore affirm the judgment in its entirety.

## II.  FACTUAL BACKGROUND

A. *Prosecution Evidence*

### 1.  The Stabbing Death of Moore

Defendant, Pena, and Hussey were friends before the murder of Moore. Moore knew defendant and Pena, and met Hussy for the first time on the night she was murdered. On July 16, 2007, defendant and Pena told a friend that Moore suggested they burglarize a home. Later that night, defendant, Pena, and the friend attempted to burglarize the home, but did not complete the burglary after they realized the home had surveillance cameras and the burglary was a "set up."

Around 1:30 a.m. on July 17, 2007, defendant called Hussey and jokingly asked whether Hussey had a shovel and some "plastic." Defendant also told Hussey he had some "dope" or methamphetamine (meth) and asked Hussey whether he and Pena could come over to Hussey's house. Defendant, Pena, and Moore arrived at Hussey's house

3

around 2:00 a.m.  Moore did not look happy to be there and initially remained outside the house while defendant, Pena, and Hussey went inside Hussey's garage.

While the three men were in the garage, Hussey brought out a rusty shovel and told defendant he could not find any plastic.  Defendant laughed when he saw the shovel and let Hussey smoke some meth.  Moore then came into the garage while Pena went to defendant's car to smoke meth.  While defendant injected himself with meth, Hussey smoked some more meth and offered some to Moore, who said no.

Almost immediately after defendant injected the meth, he pulled a pair of black gloves from his back pocket and put them on.  Hussey saw defendant walk over to Moore and punch her in the face, calling her a bitch.  The force caused Moore's head to jerk back and bounce off the back of a toolbox.  Defendant then stuffed Moore's mouth with paper towels, and Moore complied by opening her mouth.  Defendant put duct tape over Moore's mouth and said:  "Give me your fucking hands."  Moore put her hands out and defendant began taping her wrists.

Hussey went inside the house and from there overheard defendant saying, "Bitch, you're bleeding all over the place," and "Why did you set us up like that?"  When Hussey returned to the garage, he saw defendant kneeling next to Moore, who was laying on the floor surrounded by a puddle of blood.  Hussey went outside and told Pena to move defendant's car to the driveway, but Hussey did not tell Pena what he had just seen.  Pena backed the car into the driveway and stayed in the car for another 35 minutes.

4

Defendant then called loudly for Pena, and Hussey and Pena came into the garage together. Defendant was wrapping Moore's body in black trash bags with yellow drawstrings and there was a big puddle of blood on the floor. Defendant also had blood on his arms and clothes.

At that point, Pena helped defendant wrap Moore's body and carry it out to the trunk of defendant's car. Defendant then asked Hussey for some bleach to clean up the puddle of blood. Hussey pointed to a bottle of bleach, defendant grabbed it, and began cleaning the blood with the bleach and some towels. Hussey then told defendant and Pena they had to leave, and they did. Defendant and Pena drove to a nearby orange grove and dumped Moore's body there.

One or two hours after defendant and Pena left Hussey's house, defendant called Hussey to ask if he had thrown the bloody towels away, and Hussey replied: "I'm not touching them. That's not my shit." Around 7:00 a.m., defendant came back to Hussey's house to pick up the bloody towels, and later that morning defendant told Pena he killed Moore and cut her up. Defendant said he was "pissed off" at Moore for setting them up and said something about cameras. Several days later, defendant and Pena traded defendant's car for a different one and drove to San Diego to hide out.

2. <u>The Investigation and Subsequent Arrest</u>

Moore's body was discovered in a Riverside County orange grove around 9:00 a.m. on July 17, 2007, only hours after she was in Hussey's garage. During the investigation, DNA evidence was found linking defendant and Pena to the murder.

5

Moore's body had been wrapped in bed sheets and towels, then wrapped with plastic trash bags secured by twine and duct tape.

A latent fingerprint matching defendant was lifted from one of the trash bags. DNA on the twine revealed defendant was a possible major donor. The duct tape on Moore's face and mouth also had a partial DNA profile consistent with defendant and 1 in 28 men. A black trash bag with Pena's fingerprint was found on the dirt road near the location of the body. Defendant's buck knife, with Moore's blood on the blade, was found on the road along the edge of the orange grove. Black Mechanix gloves with Moore's DNA and a minor profile consistent with defendant's DNA were found near the location of the body.

Sometime after July 20, 2007, a person identifying himself as defendant called the Federal Bureau of Investigation. Defendant told an agent that he and "Ernie" (Pena) were "kickin' it with the bitch" at Hussey's house and provided directions to Hussey's house. On July 21, 2007, Pena was arrested in San Diego, but defendant ran from his car and got away. Pena gave officers Hussey's name and said he and defendant were last with Moore at Hussey's house.

On July 22, 2007, officers executed a search warrant at Hussey's house, which was only nine-tenths of a mile from where Moore's body was found in the orange grove. Hussey came home during the search and was detained. Inside the house, officers found towels similar in size and color to the ones wrapped around Moore's body. Inside the garage, officers found a bottle of bleach with dried blood on the handle matching

6

Moore's DNA and a spool of twine similar to the twine wrapped around Moore's body, also with dried blood on it matching Moore's DNA. A black plastic trash bag with a yellow drawstring similar to those used to wrap Moore's body, and silver duct tape matching that found on Moore's body, were also found inside the garage.

On July 24, 2007, customs officials stopped a truck driven by defendant at the San Ysidro Port of Entry in San Diego. When detectives spoke to defendant while he was detained in San Diego, defendant admitted he was on the run because he knew officers considered him the "No. 1 suspect." He also admitted he was wearing gloves the night of Moore's murder and traded in his car before driving to San Diego with Pena.

Blood matching Moore's DNA was found in the trunk of defendant's car. Hussey testified he recognized the knife found near Moore's body, stating: "[Defendant] got a knife very similar to that, if not that same one." Pena identified the knife as belonging to defendant.

3. The Autopsy

Dr. Aaron Gleckman performed an autopsy of Moore's body on July 18, 2007, but did not testify at trial because he had moved to the East Coast and was therefore unavailable. Instead, Dr. Mark Fajardo, the chief forensic pathologist for Riverside County and Dr. Gleckman's supervisor at the time of the autopsy, testified as an expert for the prosecution on the cause of Moore's death and the condition of her body at the time of her death. Dr. Fajardo based his testimony on the autopsy report prepared by Dr. Gleckman, the deputy coroner's report concerning the condition of the murder scene,

photographs taken at the murder scene and at the autopsy, and other relevant documents. Neither Dr. Gleckman's autopsy report nor the deputy coroner's report were admitted into evidence.

Based on the autopsy report and photographs, Dr. Fajardo agreed with the deputy coroner's finding that the cause of death was sharp force injuries to the neck. Moore's jugular vein was completely severed, and this would have caused her to bleed out in 2 to 10 minutes. Dr. Fajardo also described the condition of Moore's body at the time of her death in some detail. In his opinion, her hands were bound while she was still alive because there was no blood on her hands where the duct tape had been and her fingers were intertwined. She also had two black eyes caused by separate trauma to each eye. The blade of the knife found near her body was consistent with the length and depth of the incisions on her neck.

### 4. The 1997 Prior Crimes Evidence

Around 2:00 a.m. on August 12, 1997, Martin Murley was at his home in Riverside when his mother began running through the house and yelling that someone was trying to break into a car belonging to Murley's roommate Noah and parked on the street across from the house. Murley and his brother ran outside, and from the driveway Murley yelled, "Hey, what are you doing?" Murley saw defendant climb out of the front passenger window of Noah's car while three other people ran away from the car.

Defendant began arguing with Murley. As Murley and his brother approached, defendant pulled a knife with a four-inch blade from his pocket, pointed it in Murley's

8

direction, and said, "Leave me alone.  I'll stab you."  With the knife still pointed at Murley, defendant began walking backwards down the street.  Murley and his brother followed defendant as he continued walking down the street and pointing the knife.  They stayed around 20 yards away from defendant and were trying to keep an eye on him until the police arrived.

When Murley, his brother, and defendant were approximately three blocks away from Murley's house, Murley's father and Noah drove up in Murley's father's car and got out of the car.  At that point, defendant lunged toward Murley with the knife.  Noah tackled defendant and the two of them fell to the ground.  Murley punched defendant, which stunned him and allowed Noah to pull the knife from defendant's grip and toss it into the street.

Murley and Noah tried to hold defendant until the police arrived.  During the struggle, the people who ran from the car returned, and one began wrestling with Murley's father.  Murley's father was struck in the head with a brick and was bleeding and losing consciousness.  The other three men ran away while Murley and Noah put Murley's injured father into the car and left the scene, leaving defendant in the street.

A couple of hours later, Murley identified defendant in an infield lineup as the man who attacked him with a knife.  Defendant then gave a statement to the police.  He said he was "down on his luck" and had broken into a vehicle, several people chased him, they got into a fight, and he armed himself with his pocket knife in self-defense.  He denied attempting to stab anyone and refused to identify anyone who was with him but

9

admitted pulling his knife out and exposing it. Based on the incident, on January 9, 1998, defendant pled guilty to assault with a deadly weapon, not a firearm, causing great bodily injury. (Pen. Code, § 245, subd. (a)(1).)

B. *Defense Evidence*

The defense presented a drug expert who testified concerning the psychological and physiological effects of meth. The expert testified that meth use affects a person's ability to form and retrieve memories, make decisions, and control impulses. Meth can also induce hallucinations where the user is likely to harm himself or someone else. In closing argument, defense counsel emphasized that voluntary intoxication can negate the intent to kill element of first degree murder. She also argued there was a reasonable doubt defendant was the person who killed Moore because Hussey and Pena were present at the time of the murder and could have killed Moore.

III. DISCUSSION

A. *The Admission of 1997 Prior Crimes Evidence Was Harmless State Law Error*

Defendant claims the evidence of his 1997 knife assault on Murley was irrelevant to prove any issue other than his propensity to commit crimes, it was unduly prejudicial, and its admission violated his due process right to a fair trial. We agree the evidence was erroneously admitted under sections 1101 and 352, but the error did not infect the entire trial or deprive defendant of his due process right to a fair trial. The error was harmless under state law because, in view of the entire record, it is not reasonably probable

defendant would have realized a more favorable result had the prior crimes evidence been excluded.

1. Relevant Background

The prosecutor filed a motion in limine to admit the prior crimes evidence under section 1101, subdivision (b). The prosecutor argued that the 1997 knife assault was not remote, occurring 10 years before Moore's murder, and was relevant to show defendant harbored an intent to kill after physically attacking his victims, and the murder of Moore was not accidental but intentional. The motion emphasized the similarities between the 1997 knife assault and the murder: defendant physically attacked Murley before attempting to stab him with a knife and also physically attacked Moore before cutting and killing her with a knife. (See *People v. Robbins* (1988) 45 Cal.3d 867, 879-880 [when a defendant acts similarly in similar situations, he or she probably harbored the same intent in each instance].)

At the hearing on the motion, the defense objected to admitting the evidence in the prosecution's case-in-chief on the grounds the circumstances of the prior assault and the murder were too dissimilar, the evidence was highly prejudicial, and its admission would violate defendant's due process rights. The court ruled in limine that the evidence was admissible to show motive, common plan, and absence of mistake or accident, but reserved ruling on whether the evidence was admissible to show intent pending the presentation of the evidence. The court also considered whether the probative value of

11

the evidence was outweighed by any danger of undue prejudice, and concluded it was not. (§ 352.)

The prosecutor then presented the evidence of the 1997 knife assault in its case-in-chief through the testimony of Murley and Sergeant Keenan Lambert. Later, while discussing the jury instructions, the prosecutor asked the court to reconsider admitting the evidence on the issue of defendant's intent to kill. The court agreed the evidence was admissible on intent, noting that intent was a disputed issue in the case. The court also noted that the circumstances of the 1997 assault were less egregious than the circumstances of the charged crime, lessening any prejudicial impact of the prior crimes evidence. (§ 352.)

The jury was instructed pursuant to CALCRIM No. 375 (Evidence of Uncharged Offense to Prove Identity, Intent, Common Plan, etc.) that it could but was not required to consider the prior crimes evidence in determining the following: whether "defendant was the person who committed the offense alleged in this case; [¶] The defendant acted with the intent to kill . . . ; [¶] The defendant had a motive to commit the offense . . . ; [¶] The defendant knew that a knife could cause great bodily injury or death when he allegedly acted in this case; [¶] The defendant's alleged actions were the result of mistake or accident; [and] [¶] The defendant had a plan to commit the offense alleged . . . ."

CALCRIM No. 375 further instructed the jury to consider the "similarity or lack of similarity" between the prior crimes evidence and the charged offense in evaluating

12

the prior crimes evidence; not to consider the prior crimes evidence for any purposes other than identity, intent, motive, knowledge, and common plan or design; not to conclude from the prior crimes evidence that defendant had a bad character or was disposed to commit crime; and that if the jury concluded by a preponderance of the evidence that defendant committed the prior offense, that conclusion was only one factor to consider along with all the other evidence and was insufficient by itself to prove defendant guilty of the first degree murder of Moore, and the People still had to prove the charged crime beyond a reasonable doubt.

    2.  <u>Applicable Legal Principles</u>

Evidence that a defendant has committed a crime other than the charged crime is inadmissible to prove the defendant's conduct on a specific occasion or propensity to commit crimes.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 22; § 1101, subds. (a), (b).) Evidence of other crimes *may be* properly admitted, however, when relevant to prove facts other than the defendant's criminal propensity.  (§ 1101, subd. (b); *People v. Spector* (2011) 194 Cal.App.4th 1335, 1373.)  These other facts include, but are not limited to, the defendant's identity, intent, and motive, his knowledge of certain facts, and whether he committed the charged crime as a result of a mistake or accident or pursuant to a common design or plan.  (§ 1101, subd. (b) [listing nonexclusive categories of facts that may properly be proved by other crimes evidence].)

The admissibility of other crimes evidence generally depends upon whether and if so the extent to which it shares substantial similarities with the circumstances of the

13

charged crime, or has a tendency in reason to prove the other fact.  (See *People v. Foster* (2010) 50 Cal.4th 1301, 1328 (*Foster*); § 210.)  "Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent.  [Citation.]"  (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

Varying degrees of similarity are required depending upon the fact sought to be proved.  "The least degree of similarity (between the uncharged act and the charged offense) is required to prove intent.  [Citation.]"  (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)  "In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant '"probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]"  (*Ibid.*)  "A greater degree of similarity is required in order to prove the existence of a common design or plan."  (*Ibid.*)  The evidence "must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations.'"  (*Ibid.*)

"The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity.  For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts.  [Citation.]"  (*Ewoldt, supra,* 7 Cal.4th at p. 403.)  "'"The highly unusual and distinctive

14

nature of both the charged and [uncharged] offenses virtually eliminates the possibility that anyone other than the defendant committed the charged offense." [Citation.]'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1003.) Other crimes evidence is also admissible to show the defendant's motive for the charged crime when the prior and charged crimes are explainable as a result of the same motive. (*People v. Spector, supra,* 194 Cal.App.4th at p. 1381.)

More generally, "'[t]he admissibility of other crimes evidence depends on (1) the materiality of the facts sought to be proved, (2) the tendency of the uncharged crimes to prove those facts, and (3) the existence of any rule or policy requiring exclusion of the evidence.' [Citation.]" (*People v. Lindberg, supra,* 45 Cal.4th at p. 22.) Thus, even if other crimes evidence is relevant to prove a fact other than criminal propensity, it must be excluded under section 352 if its probative value is substantially outweighed by the probability its admission would create a substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. (*Foster, supra,* 50 Cal.4th at p. 1328.) Evidence is unduly prejudicial if it uniquely tends to evoke an emotional bias against the defendant "while having only slight probative value with regard to the issues." (*People v. Carter* (2005) 36 Cal.4th 1114, 1168.)

As defendant point out, other crimes evidence is "'inherently prejudicial'" because it produces an "'"overstrong tendency to believe the defendant guilty of the charge[d] [crime] merely because he is a likely person to do such acts." [Citation.]'" (*Foster, supra,* 50 Cal.4th at p. 1331; see *Ewoldt, supra,* 7 Cal.4th at p. 404 [evidence of

15

uncharged offense "'is so prejudicial that its admission requires extremely careful analysis.'"].) Due to its inherent risk of undue prejudice, other crimes evidence is admissible only if it has *substantial* probative value—sufficient to outweigh its inherent risk of undue prejudice. (*Foster, supra,* at p. 1331.) We review the admission of other crimes evidence for an abuse of discretion. (*Id*. at p. 1328.)

3. Analysis

As noted, the jury was instructed it could but was not required to consider the 1997 prior crimes evidence—the evidence defendant threatened to stab Murley with a knife after defendant broke into a car and Murley chased him down—in determining whether: (1) defendant was the person who stabbed and killed Moore (identity); (2) he intended to kill Moore (intent); (3) he committed the prior crime and killed Moore pursuant to a common design or plan; (4) he knew that stabbing Moore with a knife would cause her great bodily injury or death (knowledge); (5) he had a motive to kill Moore (motive); and (6) the killing of Moore was not a mistake or accident.

As we explain, the prior crimes evidence was erroneously admitted on each of these issues, principally because it was insufficiently similar to the circumstances of Moore's killing to have substantial probative value on any of these issues. The rationale for admitting the evidence on these issues appears contrived. Moreover, it overlooked the inherent danger of undue prejudice in admitting the evidence—the natural tendency of the evidence to support the impermissible inference that because defendant used a knife to threaten Murley in 1997, he stabbed and killed Moore with a knife in 2007.

We begin with the issues of defendant's motive and intent to kill Moore. Other crimes evidence is admissible to show defendant's motive in committing the charged crime when the prior and charged crimes are explainable as a result of the same motive. (*People v. Spector, supra,* 194 Cal.App.4th at p. 1381.) Likewise, to be admissible to prove defendant's intent in committing the charged crime, prior and uncharged crimes evidence must to be sufficiently similar to support the inference that defendant "'"probably harbor[ed] the same intent in each instance."'" (*Ewoldt, supra,* 7 Cal.4th at p. 402.)

The 1997 prior crimes evidence had no tendency in reason to show that defendant intended to kill Moore or had the same motive in committing each crime. The circumstances of the two crimes were completely dissimilar, except that a knife was used in each crime. Defendant threatened to stab Murley with a knife, saying "Leave me alone. I'll stab you," after Murley chased defendant down and cornered him, and it appeared Murley was going to turn defendant into the police. By contrast, defendant never threatened to stab Moore with a knife; instead, he cut her neck and killed her after he tied her up with duct tape and punched her in her face. By his words and actions, defendant's intent in threatening Murley with a knife was to scare Murley away and get him to leave defendant alone. But defendant's ostensible intent in stabbing Moore in the neck was to deliberately kill her, not scare her away. Likewise, defendant's apparent motive for stabbing and killing Moore was to punish her for setting him up to be caught

17

in a burglary, but there was no showing of any similar motive or intent to kill Murley when defendant threatened Murley with a knife.

For the same reasons, the prior crimes evidence had little to no probative value on whether defendant acted pursuant to a common plan or design in committing the two crimes. To show a common design or plan, the evidence "must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations.'" (*Ewoldt, supra,* 7 Cal.4th at p. 402.) Defendant had no apparent common design or plan in committing the prior and charged crimes.

To be sure, the prior crimes evidence was probative of whether defendant knew a knife would inflict great bodily injury or death, but this was hardly a material issue in the case. (*People v. Lindberg, supra,* 45 Cal.4th at p. 22 [admissibility of other crimes evidence depends on the materiality of the facts sought to be proved].) It is common knowledge that a person will suffer great bodily injury or death from being stabbed in the neck with a knife, and defendant was not claiming he had no such knowledge. There was therefore no legitimate need to introduce the prior crimes evidence to show defendant knew that stabbing Moore in her neck would result in her great bodily injury or death. Likewise, there was no legitimate need to introduce the prior crimes evidence to show Moore's killing did not result from a mistake or an accident, because there was no indication that Moore's stabbing death resulted from a mistake or an accident.

18

Nor was the prior crimes evidence admissible to prove defendant's identity as the person who stabbed and killed Moore.[3] Though the defense was claiming that Pena or Hussey could have stabbed and killed Moore, to be admissible to prove defendant's identity the prior and charged crimes had to "share common features . . . sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes [had to be] so unusual and distinctive as to be like a signature.' [Citation.]" (*Ewoldt, supra,* 7 Cal.4th at p. 403.) This high standard of similarity was not met here. Nothing about the prior crimes evidence showed that defendant, rather than Pena or Hussey or anyone else, was the person who stabbed and killed Moore.

4. Harmless Error

Notwithstanding the inadmissibility of the prior crimes evidence, its admission was harmless state law error. (*Foster, supra,* 50 Cal.4th at pp. 1332-1333 [applying standard of reversible error articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 to erroneous admission of prior crimes evidence].) First, the inherent risk of undue prejudice was substantially lessened by two factors: (1) as the trial court pointed out, the circumstances of the 1997 assault were much less egregious and "in no way as strong" as the circumstances of Moore's murder; and (2) the jury was informed that defendant pled

---

[3] The People mistakenly claim the jury was *not* instructed that it could use the 1997 prior crimes evidence in determining whether defendant was the person who stabbed and killed Moore. The jury was indeed instructed it could use the prior crimes evidence to decide "whether or not: [¶] [t]he defendant was the person who committed the offense alleged in this case[.]"

19

guilty to assault with a deadly weapon, causing great bodily injury, based on the 1997 assault. (*Ewoldt, supra,* 7 Cal.4th at pp. 404-405 [discussing factors affecting probative value and prejudicial effect of uncharged crimes evidence].) Further, the jury was instructed not to conclude from the prior crimes evidence that defendant had a bad character or was disposed to commit crime. (CALCRIM No. 375.) It is thus unlikely the jury punished defendant for the 1997 assault on Murley by finding him guilty of murdering Moore.

Furthermore, defendant admitted killing Moore because she set him up to be caught by surveillance cameras in the attempted burglary defendant perpetrated with Pena. Pena and Hussey consistently testified that defendant, and neither of them, was the person who stabbed and killed Moore, and both Pena and Hussey identified the knife found near Moore's body as belonging to defendant. DNA evidence also linked defendant to Moore's murder. In view of the entire record, it is not reasonably probable defendant would have realized a more favorable result had the prior crimes evidence not been admitted on any issue. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

5. No Due Process Violation

Lastly, defendant claims the admission of the 1997 knife assault violated his due process right to a fair trial because it was not relevant to any disputed issues. We disagree because the prior crimes evidence did not "infect[] the entire trial." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; cf. *McKinney v. Rees* (9th Cir. 1993) 993 F.2d 1378, 1384-1386.) As noted, the jury was instructed it could but was not required to consider

20

the prior crimes evidence in determining the issues discussed and not to consider the prior crimes evidence to infer defendant had a propensity to commit crimes. Furthermore, the prosecution presented ample evidence that defendant stabbed and killed Moore, independently of and apart from the prior crimes evidence.

B. *No Sixth Amendment Confrontation Clause Violation*

Lastly, defendant claims Dr. Fajardo's testimony concerning the condition of Moore's body at the time of her death and the cause of her death ("[s]harp-force injuries to neck") violated his Sixth Amendment right to confrontation. Dr. Fajardo based his testimony, in part, on an autopsy report prepared by Dr. Gleckman, the pathologist who performed Moore's autopsy. Dr. Gleckman did not testify at trial because he had moved to the East Coast and was unavailable. The autopsy report was not admitted into evidence.

Defendant claims that statements in the autopsy report concerning the condition of Moore's body and the cause of her death violated his Sixth Amendment right to confront witnesses against him, namely, Dr. Gleckman, because the statements were testimonial hearsay and he did not have a prior opportunity to confront and cross-examine Dr. Gleckman concerning the statements. (*Crawford v. Washington* (2004) 541 U.S. 36, 51-52.) As defendant acknowledges, however, the California Supreme Court recently rejected a substantially identical claim in *People v. Dungo, supra,* 55 Cal.4th at page 621, and this court is bound by *Dungo.* (*Auto Equity Sales, Inc. v. Superior Court, supra,* 57 Cal.2d at p. 455.) Defendant also concedes he is raising the confrontation clause claim

solely to preserve it for federal review.  (See, e.g., *People v. Miranda* (2011) 192

Cal.App.4th 398, 402, fn. 1.)  In light of *Dungo*, we reject the claim.

### IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.


We concur:

McKINSTER
Acting P. J.

RICHLI
J.